23-1239. Thank you so much. Mr. Licton, am I pronouncing your name correctly? Yes, you are. Good morning, Your Honor. Good morning. And you've reserved two minutes. Is that correct? Correct. Okay. You may begin. My name is Harold Licton. I have the pleasure of representing the plaintiffs in this case. As Judge Calabresi pointed out in his dissent in Mujere, the misclassification of workers as independent contractors is near epidemic proportions, both in Connecticut and around the country. And there are now hundreds of federal and state courts' decisions regarding this issue. And in most of these states, deductions from wages where people have been misclassified have been held to be unlawful. That's not the case in Connecticut because of the MITEC case decided some 22 years ago in the context of a bonus plan, sorry, the context of a commission plan saying that you determine the commission after you look at the products that have been given back. We say that that doesn't relate to the issue here. Now, Connecticut uses a very strict ABC test to determine.  Can I ask? Yes. If we, I know that you think, you argue that Dunn changes the scenario, but if, let's leave Dunn to the side for now, would you agree that under Mujere and MITEC you would lose? No. Okay. I think they're very different cases, and that's what I want to explain. The MITEC case involved how you determine a commission based on a commission plan that was clear on its face and which the worker knew about, and it basically said your commission is based on what actually gets sold, not what's returned. The Mujere case involved the complex relationship between the franchise statute and the worker who claimed to be an employee. If you look at Judge Sessions' comment in Prevention versus Bimbo, where he comments on Mujere, he says . . . I'm sorry. Is your argument that Mujere only applies when we're dealing with franchisers and franchisees? I'm saying that much of the decision in that case relates to that fact and doesn't relate to the situation here because there's one huge difference between the two cases. In Mujere, there were set amounts, and the plaintiffs in that case were saying we get all the money derived from the customers and the franchisor gets none. The court said, well, that can't be the case. If so, you could never have a franchise relationship because the franchise or would never receive any income. In this case, what makes this particularly pernicious is that there's provisions in this contract that basically say that the workers who are full-time workers working 70, 80 hours a week, not making that much money, that they have to indemnify the company for any damage caused. If it continues to run over, they can have money willy-nilly without first authorization taken out of their check. They can have $1,000 taken out of their pay if they can't finish the run. This is all in the record because their car breaks down. There are numerous types of deductions which they make. If you scratch the mattress, they'll take $1,000 out of your pay. Well, I recognize that all of these cases are different from each other in some respects, right? Right. But I'm having trouble understanding the difference in principle. And I put Mujere to one side. First of all, that's just us, and it's not necessarily authoritative on what Connecticut law is, given that Connecticut law could change over time. But my take seems to me closer in that there is an arrangement which, as I understand it, is pretty much laid out in the contract, isn't it, about that you will be liable for any property damage or damage to the goods. Yes, but if that was the case— And on the first bounce, you'll get paid—here's what you're going to get paid, 20%, 5%, whatever it is, of all of your sales. But then if things get returned, we'll take out for that. And indeed, we're even going to take out when things get returned to your department, even if you weren't the seller, you pay a pro rata share back. That's all defined in the scope of the agreement. So why isn't this extremely similar? The reason is that Connecticut Supreme Court has said that there's important public policy involved in the wage statute. If you accept that argument, Your Honor, this is no different when you strip it down to assessance of a waiter, and the company makes you sign a policy at the beginning of the day, and it says you break it, you pay for it. Yeah, well, I noted you had that example in your brief, but it was not followed by a citation that said this is plainly improper. But that's what they're— So, I mean, suppose they did have that policy in a restaurant in Connecticut. What tells us that that is obviously unacceptable? Is there some Connecticut case that says that? Well, here's the reason. It's because of the statute itself. If you accept that premise, that whatever you do that the company doesn't like, they can, by policy, say we're taking that money out of your paycheck, then you eviscerate, you make meaningless Chapter 3171E that forbids the withholding of wages. And this is no different than the Lockhart case, which was favorable to the plaintiff, although it was under 73D, in which they tried to fire the individual because they wouldn't pay the insurance premium for an accident that they caused, and they said, no, that violates the public policy of Connecticut. So, I understand being queasy about allowing contracting to be getting around the protections, especially the public policy protections, but it seems to me in this instance, Connecticut has spoken in a couple of different ways. It has protections, but it also has laws and interpretation and binding precedent that says that people can bargain. So I think what we need your help from is articulating how we harmonize both of those. And one of the things that I think might do the work is the idea of a minimum wage. Like a minimum wage might be the way you make sure that people haven't been in a position where they've bargained away everything, but you've not alleged that they're not even making minimum wage. So, I mean, I guess I have a two-part question. The first is, how are we harmonizing these different public policy that, or the different pieces of public policy that Connecticut has, and then what are the protections that you think exist to make sure that nobody goes too far in the different directions? Well, I don't think you can, because one, they mischaracterize these individuals, misclassify them as independent contractors, so arguably they wouldn't even be responsible for paying overtime or the minimum wage. Well, but isn't the argument being made on the other side that assume, arguendo, they are workers, take that out of the case, assume that they are employees, and then they argue that would still be okay? Right. But then the question is, what does 71E mean? I think what the court's duty here is, is to harmonize my tech with 71E. Now, 71E and 73B prohibit the taking and withholding of funds from someone. Now, in this case, my clients make the delivery. There's a schedule, Schedule A. Schedule A says, if you make the delivery, you get paid $38 for that delivery. Down in another section of this contract of adhesion, there's a provision that says, whatever you do that we don't like, we can take money out, whether it's for misconduct or whether it's because we think you did damage, even if you didn't. There's a document in the record, which we cite, where five months after the fact, one of the plaintiffs was told that he would have to have $639 deducted from his pay, even though he had earned that five months ago. 71E has to be, and this is why I think certification is appropriate, if you rule that my tech says that whatever the arrangement, you can take out money and the wage is the final result, not before the deductions. Then you've made 71E and 73B meaningless, and I don't think that's what the Connecticut legislature meant. I believe that my- How is this different from a contract that said, we'll only pay you $19 for a delivery, but if there are no complaints of damage after five months, we'll give you a $1,000 bonus? Well, under WIMS, the Connecticut Supreme Court said that we agree that under 71E, and they said that was a deduction in WIMS, it has to be knowing, intelligent, and informed. How can you have knowing, intelligent, and informed deductions when the worker, the poor worker who's doing the delivery, has no idea what's going to be deducted from his check and when? Again, isn't that exactly the same as the commission story? You don't know what's going to be returned. You don't know how many things are going to be returned because some other salesman in the department is very sloppy with his practices and gets an undue number of returns that don't necessarily get attributed to him. No one knows what the actual deductions are going to be in advance. It's not like taking, it's not like federal tax withholding. Well, you may be right, Your Honor, but you may be wrong because they were dealing with the very limited situation of a commission structure and how you get to the commission. So it's simple in that case, and here it's more complex and discretionary what the deductions are? Is that the problem? It's very complex, and it runs against the holdings of many other states where we cited to you our sister state of Massachusetts where I'm from, the same exact case involving RXO. They lost on summary judgment. They lost on the deductions issue, the California XBO case. Most states- Didn't the state court point out in that case that this is not, there's a difference between Massachusetts law and Connecticut law? There's only an interpreter. When you read the judge's decision, that's Muniz v. RXO, he said it's the interpretation of the wage statute, Massachusetts interprets its wage statute as prohibiting deductions after the wage is earned. The point I want to make, Your Honor, is once you deliver that product under Schedule A, you've made the delivery, you're entitled to your $38 or whatever it is. That strikes me as the meaning of wages under 31A. To say that no, that's not your wage, your wage is whatever else we want to deduct down the road because we don't like what you did is not an appropriate interpretation of what wage means. Now, I may be wrong, I understand that, and I may be right, but I think that's why this case should be certified. With all due respect, my tech is a 22-year-old decision. There's never, there's not been a case since then, and there is one case that is very similar since then, which is the Lockwood case from 2008. And there, they held under 73B that if you make someone at the risk of being fired pay for the insurance deductible for an accident you caused, that's illegal under 73B and the person can't be fired. How is that any different from the situation here? Was there a contract in Lockwood? What? Was there a contract in Lockwood? There was a policy. Well, but it's very different to have a policy, the employer has a policy, than to have a contract that is signed by the employee that authorizes the deduction, right? And it's also completely distinct from what they earned in the wage agreement, right? That had to do with future earnings that didn't even cover what, the work that was being done at the moment. Well, it's sort of complicated because there were two employers in that case. But as I read that case, they said that you can't exact under the public policy of 73B, the person paying money for damage where 73B prohibits you from requiring money to be withheld or diverted. Okay, thank you. Okay, I have much more to say, but I'll reserve it. Thank you. Let's hear from you on the bottle. Thank you so much. Good morning. My name is Adam Lounsberry. I'm from Jackson Lewis, and I represent RXO Last Mile. Appellants here have made a very ambitious attempt to avoid the legal reality in this case. This case is not, as appellants would have it, a wage deduction case. This case, just like Lugo, is a wage formation case. And you can tell it's a wage formation case because the undisputed facts show that the parties agreed to the method for calculating what was due to them. And perhaps most importantly, RXO Last Mile paid what was due under the agreement. Indeed, plaintiffs have even conceded that they were paid everything due under the agreement. So can you explain your theory behind how we don't let people contract away rights that are protected under the Connecticut statute? Where is the limit to one's ability to knowingly and voluntarily enter into a contract? Surely. I think if we go back to MITIC, it explains the public policy behind the statute very clearly. And it simply says that Connecticut's wage statutes are there to protect the sanctity of the wages earned by an employee pursuant to the agreement. And if that agreement is violated, then it's a violation of Connecticut law. If the employer tries to invade those wages that was agreed to upfront, then that too would be a violation of law. That could be potentially a deduction or a refund under the other statutes. However, the contract itself, so long as it otherwise comports with the law, such as with minimum wage or otherwise, is not, Connecticut expressly said, MITIC expressly says, that it's not going to get in the way of the party's right to contract. And in fact, if you look at the wage statute itself, under 3170, I'm sorry, bear with me for just a moment, 3171A. So is there any bargain for agreement that you think would violate the statutory scheme? Should it improperly reduce the wage below minimum wage? Let's get out of the improper. We're trying to figure out what is improper. I'm asking what you think is a limit to what can be bargained for in a wage agreement. And at what point does it violate the statutory scheme? I can't imagine any agreements other than those that would expressly violate the other statutes that surround the wage statutes. So anything that is not, so anything that is knowing involuntary, in your view, is appropriate under both the minimum wage and the anti-kickback statute. Yes. Even if that means going below minimum wage? No, no, no, no, no, no, no, no. Absolutely not. So long as it comports with the other statutory requirements, such as I can think of another section that plaintiffs have actually raised. Wherein the employer can't foist workers' compensation premiums on the employee itself. In other words, you can't pay for your own workers' comp premiums. So you couldn't have a contract where you said, I'm going to pay you $30 an hour to work at my store. But at the end of each week, if we weren't very busy, or we didn't do very well, I'm going to go back and deduct that. I'm going to pay you $8 an hour, instead of the $30 an hour we agreed on, which would be below the Connecticut minimum wage. That would be problematic, even if the employee agreed to it, but solely because it violates the minimum wage statute. Not only solely because, but because it violates the actual wage agreement. If the hypothetical is that we're agreeing to pay you some sum of money for the week. Unless things don't go well. Unless things don't go well, then yes, absolutely. So long as it otherwise comports with the statutory requirements. So if it instead said, we agreed to pay you $40 an hour to work at our store. But at the end of each week, we're going to look back and see how the week went. And we're an outside business, and there was a hurricane all week. So we didn't get a lot of business. So instead, we're going to cut your paycheck in half. We're going to pay you $20 an hour, which exceeds the Connecticut minimum wage. So it's not a problem there, but that's okay. You can set up a conditional wage effectively. That's a more express conditional wage than what we have here. That's a very direct. It's 40 if things go well, it's 20 if things go badly. But that's okay. Okay. That seems an easier case for you, right? Because in that situation, the wage is expressly a floating wage. It's, you know, $40 in good times, 20 in bad. And, you know, we'll find out week by week whether it's a good week or a bad week. But here, you never know exactly what's, even after the week happens, you don't know what deductions are likely to show up based on that week's performance. Right. Which is precisely why the agreement here, the delivery service agreement has gross revenue that accrues to the plaintiffs at business entities, and then later on is reconciled with losses throughout the course of the week. And at the end, the net gets paid. And so long as that net is paid as agreed between the parties, then it's lawful under my tick and its progeny. The contract expressly provides that this is, the contract between, I forget which is the old name and the new name of your client, but the initials and the driver's limited liability company is not exclusive in both directions. Now, we know it's not exclusive in the sense that RXO has lots of driver companies that it contracts with. But it's also not exclusive to the other side, right? The plaintiff's companies, if they're not satisfied, can get other customers. That's right, to get other customers. That's accurate. It is not exclusive in the sense that the plaintiff's companies could go out and perform motor carrier work for other companies. They're federally authorized under the statutes. And they can offer that work to the public and, you know, within the appropriate market as they see fit. Can you talk to me about how you think Dunn changes the landscape? I don't think Dunn changes the landscape at all. Dunn was a case where the employer and the employee reached an agreement about what the salary and wage was going to be for Mr. Dunn. Later on, Mr. Dunn went out and received sort of a second source of income in receiving these flight fees. And the original employer said, hang on a second, I gave you that opportunity. So what I'd like to do is have you pay me part of those fees back from your second income because I sort of gave you this opportunity, right? At least that's what I imagined the rationale was behind it. And what the court said was, no, that's actually an improper refund of wages under the statute because the employer was conditioning continued employment upon the payment of those additional fees that Mr. Dunn was accruing from these separate endeavors. And ultimately, the court came down and said that is an improper refund under the statutes, but that's not what we have here. We don't have this sort of side agreement. We don't have a revision to the agreement. We don't have a change in wages here. We, the refund there is completely separate and apart from the relationship that the parties. So you'd have a Dunn violation if one of these drivers did take on work for other shippers of goods and RXO said, well, we want to take 10% or we want to dock your wages that you earned from us, 10% of what you earn outside. Arguably, so long as there was a representation and understanding and otherwise satisfies the elements of the statute, I regenerated that. Well, I mean, again, to make it more like Dunn, this would have to be something that came out of the blue, not something that was already in the contract. I mean, in Dunn, it was not part of Dunn's employment contract from the beginning that if you make any outside money, we get a cut of, you're allowed to do it, but we get a cut. That wasn't part of the agreement. Not only that, Dunn had originally asked, would you pay for my training that was necessary to get that outside source of income? And then when the employer said, well, maybe that'd be a sort of joint venture, Dunn said, no, no, no, I'm not, never mind. We're not going to have that agreement. He's expressly rejected that agreement. And the employer then said, well, you're fired if you don't kick back the money. That strikes me as quite different from anything here. Absolutely, 100% different. Do you want to talk about Lockwood? Yeah, Lockwood is also, fits in that refund category and not actually in the wage formation or deductions category. Lockwood was a case in which, as we heard, the employer maintained a policy that if an employee was in an accident while performing work, they could choose one of two things. They could choose to subsidize the employer's insurance deductible or they could choose to be fired. In this case, or in Lockwood rather, the employee refused to pay the deductible and was terminated. That's almost perfectly lined up with the refund type case as in Dunn. So, Lockwood's entirely distinguishable and Lockwood. Well, but was, in Lockwood, was that part of the original agreement or not? It was the employer's policy. It wasn't something that was in whatever contract there was between the employee and the employer? No, I believe it was in a policy only. Thank you so much. Thank you very much. A couple quick points. Please. First of all, Judge Lynch, it's not true that this is a non-exclusive relationship. The testimony in the record is that all of these workers worked for RXO full time, six or seven days a week, and they could not have any other loading. Well, wait, could not have? Because the contract is expressly to the contrary, isn't it? No. Well, it says that, but XBO is a co-insured on the truck. They would not allow someone to have other products on the truck while they're doing it. It may be that what XBO is saying, well, on a Sunday you could do it, but these drivers are working five, six days a week, 70 hours a week. So that's a question of fact. We hotly dispute that this was a non-exclusive arrangement. This was an exclusive arrangement, and that's what the drivers have stated. Secondly, with respect to this issue, I would point out- I wish to be very clear about that, because when I read the brief, I thought that all that was said was that, in fact, these plaintiffs work 70 hours a week and only work for the company. Are there allegations or testimony that says that was required by the company? Yes. That they were not permitted to, that the company said, whatever it says in the agreement- Yes. You should know this is exclusive. Yes. For example, if they didn't show up for their load on a day, and they were assigned loads every day, they would be fined $1,000. So I suppose they could have gone off and done something else and been fined $1,000, but as a practical matter, and it's at least a disputed issue in the record, they were full time only working for RXO. I want to point out that in the Gison case, the court explained that if a provision in an employment contract, quote, acts to negate the wage statutes, however, that provision violates public policy. So it's not enough that the agreement itself says that this is the case. You still have the right to look at what that provision is in the contract and address whether it would violate the public policy of the state of Connecticut. The right not to have money willy nilly withheld from your checks is a public policy right. It's an important right for workers, and therefore, I think, again, it's quite possible that the Connecticut Supreme Court would say that even though it's in the agreement, and we don't think it's very clear, but even if it's in the agreement, it violates the public policy of 73B and 71E. And just one last, sort of a bottom line question. I think that as a matter of form, you are asking us to decide this case ourselves and reverse the district court, but it sounds to me as if de facto, what you're really saying is, at least, we should give the Connecticut Supreme Court an opportunity to revisit MITIC. And what's the harm in letting them tell us that they still adhere to that and that this case is governed by it? I couldn't have said that any better, Your Honor. I am not asking you to decide this issue. I fully recognize that this issue is far from clear. You have a 22-year-old decision from a completely different court that says one thing in MITIC. You have a court that recently in Dunn seems to say something else. I'm not asking you to decide this case. I'm asking you to certify the question to the Connecticut Supreme Court and give them an opportunity. There is no harm in doing this whatsoever. And I think it would be very helpful, not only for this case, but in all these cases involving the misclassification of independent contractors. And the final thing I want to say is that under Connecticut law, as we point out in our brief, where a contract purports to waive statutory rights, and we believe it is waiving the rights under 71E, if you adopt this reasoning in MITEC. The following factors are relevant in looking at whether the validity of such waivers is appropriate. The conspicuousness of the waiver, whether it was buried in the middle of a lengthy agreement, whether it was printed in a different typeface or font, whether the party seeking to avoid enforcement was represented by counsel. One more second, sir. Go ahead, finish up. I can give you the cite to this. Whether the opposing party had the opportunity to negotiate the terms of the agreement, which our clients did not. That's not part of the quote. And whether the opposing party had been fraudulently induced into agreeing specifically to the waiver. And that's L&R Realty versus Connecticut National Bank, 246, Connecticut 1.  We will take the case under advice. Thank you very much, Your Honors.